UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LAWRENCE D. HARRIS,

                                        Petitioner,

             - v -                                                    9:04-CV-1268
                                                                      (LEK/GJD)
JOSEPH SMITH, Superintendent,

                                        Respondent.
_____

APPEARANCES:                            OF COUNSEL:

LAWRENCE D. HARRIS
Petitioner, pro se
97-A-4999
Sullivan Correctional Facility
Box 116
Fallsburg, New York 12733

HON. ANDREW M. CUOMO              MICHELLE E. MAEROV, ESQ.
Attorney General for the          Assistant Attorney General
State of New York
Attorney for Respondent
120 Broadway
New York, NY 10271

LAWRENCE E. KAHN
U.S. District Judge

**MEMORANDUM-DECISION AND ORDER**

I.      **BACKGROUND**

        According to the testimony adduced at trial, between January 1996 and April 1996,

Petitioner Lawrence Harris, as well as Anthony Wright, engaged in the sale of crack cocaine at

the home of James Hill and his fiancee, Sharon Cannizzo, in the Town of Caroga, Fulton County.

See Transcript of Trial of Lawrence Harris (7/3/97) ("Trial Tr.") at pp. 1022-31.  In early 1996,

Hill and Cannizzo, both of whom were admitted crack cocaine users, agreed to allow Harris and

Wright to sell cocaine out of their house in exchange for drugs for their own personal use.  Trial Tr. at pp. 849, 1024-29.  Pursuant to their arrangement, Harris and Wright were to go to the Caroga Lake residence at least once per week in order to supply the crack cocaine.  Trial Tr. at pp. 759-60, 1031-32.[1]  Hill took money directly from the customers, went to a designated bedroom, turned the money over to Harris and Wright in exchange for the drugs, and returned to the customer with the drugs.  Trial Tr. at pp. 743-48, 786-87, 1032-39.  Cannizzo assisted the group by admitting customers into the house and also by both receiving and placing phone calls to Harris and Wright.  Trial Tr. at pp. 789-91, 795-98.  The record also established that Hill and Cannizzo contacted Harris and Wright through the use of a "beeper" if they were not in the house when a potential customer arrived.  Trial Tr. at pp. 791-94, 798-803, 1041-47.[2]

On March 9, 1996, Robert Warner informed a member of the Fulton County, New York Drug Task Force that drug sales were occurring at the Caroga Lake residence.  Trial Tr. at pp. 410-14, 970-74.  Warner thereafter agreed to act as a confidential informant for law enforcement agents, and subsequently participated in controlled purchases of cocaine from that house.  Trial Tr. at pp. 412-414, 977.  At trial, Warner testified that during the controlled purchases of narcotics, he entered the Caroga Lake residence and gave money to Hill.  Trial Tr. at pp. 979-82.  Hill then left the room and returned with the crack cocaine, which Warner in turn provided to the police.  Trial Tr. at pp. 979-84.

Dan Thum testified that he went to the Caroga Lake residence between twenty and thirty

---

[1]  Sometimes the two stayed at the house for several days.  Trial Tr. at pp. 737, 759-60, 1031-32.

[2]  In March 1996 alone, more than one hundred drug transactions occurred at the Caroga Lake residence.  Trial Tr. at p. 787.

2

times between January and April 1996 in order to purchase cocaine.  Trial Tr. at p. 1155.  During

one purchase in January 1996, he observed an Isuzu Trooper, which Harris was subsequently

found to be driving, see Trial Tr. at pp. 1230-33, in the driveway of the house and also observed

two well-dressed African-American men in the living room watching television.  Trial Tr. at pp.

1161-63.  At trial, Thum specifically identified Harris as one of those men.  See Trial Tr. at pp.

1163-65.  Todd Heroth testified that he went to the Caroga Lake residence approximately twenty

times between January and April 1996 to purchase cocaine, Trial Tr. at p. 1097, and that when he

purchased cocaine from Hill on April 2, 1996, Harris was at the house.  Trial Tr. at pp. 1102-03.

On April 3, 1996, Hill, Cannizzo, Harris and Wright were arrested at the Caroga Lake

residence.  Trial Tr. at pp. 811-15, 1022.  A search of the home disclosed the presence of 5 1/2

ounces of cocaine, an electronic scale, razor blades, and plastic bags in the bedroom from which

Harris and Wright apparently transacted their business.  Trial Tr. at pp. 1283, 1321-22, 1494-95.

In the proceedings brought by the Fulton County District Attorney, Warner testified

before the grand jury pursuant to a cooperation agreement into which he had entered wherein the

prosecutor agreed to not bring felony charges against him for certain criminal conduct in which

he had engaged in prior to the controlled buys.  Trial Tr. at pp. 1013-15.  Hill and Cannizzo also

entered into cooperation agreements with the District Attorney and testified before the grand

jury.  Trial Tr. at pp. 811, 1072-73, 1089.

On July 24, 1996, a Fulton County grand jury returned a nine count indictment against

Harris and Wright.  In that accusatory instrument, the two were charged with three counts of

criminal sale of a controlled substance in the third degree, three counts of criminal facilitation in

the fourth degree, criminal possession of a controlled substance in the first degree, criminal

3

facilitation in the second degree, and conspiracy in the second degree.  E.g., Trial Tr. at p. 323.

Wright subsequently moved for a severance of his trial from that of Harris, which the County

Court denied.  Trial Tr. at pp. 4-8, 51.  Harris' jury trial on the charges commenced on June 27,

1997 in Fulton County Court with County Court Judge Angelo D. Lomanto presiding.

Several days into the trial, sworn juror C. Lamb requested to speak with Judge Lomanto

Trial Tr. at p. 631.  Judge Lomanto then questioned her, in camera, in the presence of both

defense counsel and the District Attorney.  Trial Tr. at p. 631.  At that time, Lamb stated that

before she was sworn as a juror, a woman with four children had sat next to her in the courtroom.

Trial Tr. at pp. 631-32.  The woman informed Lamb that she was in search of a place to stay, and

Lamb responded by providing the woman with the names of some local hotels.  Trial Tr. at pp.

632-33.  In that list, Lamb included the name and phone number of a lodging facility where her

husband was employed.  Trial Tr. at p. 633.  At the conference, Lamb informed the court that,

after she was selected as a juror, she thought about her conversation with the woman about

lodging, and ultimately came to the conclusion that her suggestion might not have been a good

idea.  Specifically, she advised the County Court:

> [T]he only thought that came to me at that point was
> if they lost the case, would there be any thought of
> retaliation against me now that I've given her my
> phone number and address and name.  But I just
> thought well I'll just have to live with that, there's
> nothing I can do.

Trial Tr. at p. 634.  Later on during the trial, Lamb saw the woman in a hallway with Wright.

Trial Tr. at pp. 634-35.  The woman smiled at Lamb, and although Lamb felt awkward, she

returned the smile and politely asked the woman whether she had found a place to say, to which

she responded she had.  Trial Tr. at pp. 634-35.  Lamb informed the court that the "only impact"

she felt as a result of the foregoing was to "have a little bit of concern."  Trial Tr. at p. 636.  She

further declared that her interaction with the woman:

> wouldn't change the way I would vote or my
> impartiality at all. The only thing it could possibly
> do is make me feel a little more concerned for my
> safety in the future.  But I don't think that's a valid
> thing to base decisions on.

Trial Tr. at p. 636.[3]  Lamb further mentioned that she shared her concern regarding the incident

with juror S. Benson in the presence of a male juror, whom she did not know by name.  Trial Tr.

at pp. 637-41.

William Lorman, Esq., Harris' counsel, as well as William Martuscello, Esq., defense

counsel for Wright, questioned Lamb about the foregoing.  Trial Tr. at pp. 639-50.  In addition,

Fulton County District Attorney Polly Hoye ("D.A. Hoye") examined Lamb.  Trial Tr. at pp.

650-51.  Neither Lorman nor Martuscello objected to conducting such hearing in the absence of

the Defendants.  Trial Tr. at pp. 630-82.

At the request of defense counsel, Judge Lomanto conducted further inquiry of several

other jurors, including Benson, to determine whether Lamb's conduct regarding the foregoing

had affected their ability to remain fair and impartial.  Trial Tr. at pp. 653-54.  Benson indicated

that she did not have any concerns for her personal safety, and that her knowledge of Lamb's

contact with the woman would not affect her own ability to be fair and impartial.  Trial Tr. at p.

656.  When the other jurors were asked by Judge Lomanto whether anyone had overheard a

---

[3] Lamb repeatedly assured the court and counsel that while she had a "teeny bit" of
concern for her safety, she would nevertheless be fair and impartial in arriving at her decision
regarding the charges against the defendants.  Trial Tr. at pp. 636-37, 642, 647-51.

conversation between Lamb and Benson, no juror responded in the affirmative, and the Court was unable to determine which male juror, if any, had been present when Lamb initially informed Benson of the incident.  Trial Tr. at pp. 671-682.

At some point following the above discussion with the jurors, Harris and Wright were brought into chambers. Trial Tr. at p. 682.  The circumstances of the hearing were recounted in the presence of the two Defendants, after which counsel for the Defendants moved for a mistrial and the disqualification of jurors Lamb and Benson. Trial Tr. at pp. 682-89.[4]  The trial court denied those applications and also refused a request to disqualify any of the jurors.  Trial Tr. at pp. 690-91.

In their defense to the charges against them, Harris chose to testify in his own defense while Wright refrained from testifying.  Trial Tr. at pp. 1547-1609.  In his testimony, Harris declared that he only visited the Caroga Lake house on a few occasions, and made no statements that implicated either himself or Wright in the drug sales.  Trial Tr. at pp. 1571, 1550-1608.

At the conclusion of the trial,[5] Harris and Wright were found guilty of all nine counts. Trial Tr. at pp. 1791-95.

On July 30, 1997, Harris was sentenced as a second felony offender to various terms of imprisonment, resulting in an aggregate sentence of sixty-two and a half years to life.  See Transcript of Sentencing of Lawrence Harris (7/30/97) at pp. 15-18.

_____

[4] Both Harris and Wright consented to these motions by their respective attorneys. Trial Tr. at p. 689.

[5] Three days before the verdict, Wright, who was free on bail, absconded.  Trial Tr. at pp. 1120-30.  After efforts to locate Wright failed, the trial continued in his absence.  Trial Tr. at pp. 1135-44.

Harris and Wright consolidated the appeals of their convictions and sentences to the New York Supreme Court, Appellate Division, Third Department.  On November 15, 2001, that court affirmed the convictions in all respects.  People v. Harris, 288 A.D.2d 610 (3d Dep't 2001).  However, in the interests of justice, the Appellate Division mandated that all sentences imposed on Harris run concurrently, reducing the minimum term of imprisonment to which Harris was subject to twenty-five years to life.  Id. at 618-20.  The New York Court of Appeals granted Harris' request for leave to appeal on January 22, 2002, People v. Harris, 97 N.Y.2d 705 (2002), and on November 21, 2002, the Court of Appeals affirmed the order of the Appellate Division in all respects.  People v. Harris, 99 N.Y.2d 202 (2002).

In an application dated February 13, 2004, Harris moved to vacate his judgment of conviction pursuant to New York's Criminal Procedure Law ("CPL") § 440.10 ("CPL Motion").  That application was opposed by the District Attorney, and in a Decision and Order dated August 19, 2004, Fulton County Court Judge Felix J. Catena denied Harris' CPL Motion.  See People v. Harris, No. 22-96 (Fulton Cty. Ct. Aug. 19, 2004) ("August, 2004 Order").

### B.    Proceedings in this Court

Harris commenced this action, pro se, on November 1, 2004 in the Northern District of New York.  See Petition (Dkt. No. 1) ("Petition").  In his Petition, Harris asserts several grounds in support of his request for federal habeas intervention.  Specifically, he argues that: (i) he received ineffective assistance of trial counsel because his court-appointed attorney labored under a conflict of interest; (ii) he was wrongfully excluded from the portion of his trial when the Court conducted a hearing into the potential tainting of juror Lamb; (iii) the County Court committed reversible error when it permitted Lamb to remain on the jury; (iv) comments made

7

by two prosecution witnesses "poisoned the trial;" (v) the prosecutor and Harris' prior attorney

intentionally withheld exculpatory evidence from Harris; and (vi) the prosecutor knowingly

suborned perjurious testimony.  This Court thereafter directed the Respondent to file a response

to the Petition, Dkt. No. 5, and on July 29, 2005, the Office of the Attorney General for the State

of New York, acting on Respondent's behalf, filed a response in opposition to Harris' pleading.

See Dkt. No. 19.  In opposing the Petition, Respondent argues that Harris' claims lack merit.  Id.

Harris thereafter submitted a traverse in further support of his application.  See Dkt. No. 20

("Traverse").  This Court has considered the above-referenced submissions, together with the

state court records provided to the Court, in conjunction with its review of the Petition, which is

currently before this Court for disposition.[6]

**II.**     **Discussion**

      **A.**     **Standard of Review Applicable to Harris' Claims**

      The April 1996 enactment of the Antiterrorism and Effective Death Penalty Act

("AEDPA") brought about significant new limitations on the power of a federal court to grant

habeas relief to a state prisoner under 28 U.S.C. § 2254.  In discussing this deferential standard,

the Second Circuit noted in Rodriguez v. Miller, 439 F.3d 68 (2d Cir. 2006) that:

> a federal court may award habeas corpus relief with respect to a
> claim adjudicated on the merits in state court only if the
> adjudication resulted in an outcome that:  (1) was "contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United
> States"; or (2) was "based on an unreasonable determination of the
> facts in light of the evidence presented in the State court
> proceeding."

_____

    [6] In accordance with General Order No. 32, this Court rescinds the prior reference of
this action to Magistrate Judge Gustave J. DiBianco.

Rodriguez, 439 F.3d at 73 (quoting 28 U.S.C. § 2254(d)); see also DeBerry v. Portuondo, 403

F.3d 57, 66 (2d Cir. 2005); Miranda v. Bennett, 322 F.3d 171, 177-78 (2d Cir. 2003); Boyette v.

LeFevre, 246 F.3d 76, 88 (2d Cir. 2001).  In providing guidance concerning application of this

test, the Second Circuit has noted that:

> [A] state court's decision is "contrary to" clearly established
> federal law if it contradicts Supreme Court precedent on the
> application of a legal rule, or addresses a set of facts "materially
> indistinguishable" from a Supreme Court decision but nevertheless
> comes to a different conclusion than the Court did.  [Williams v.
> Taylor, 529 U.S. 362,] at 405-06 [2000]; Loliscio v. Goord, 263
> F.3d 178, 184 (2d Cir. 2001).... [A] state court's decision is an
> "unreasonable application of" clearly established federal law if the
> state court "identifies the correct governing legal principle from
> [the Supreme] Court's decisions but unreasonably applies that
> principle to the facts" of the case before it.  Williams, 529 U.S. at
> 413.

Thibodeau v. Portuondo, 486 F.3d 61, 65 (2d Cir. 2007); see also Williams v. Artuz, 237 F.3d

147, 152 (2d Cir. 2001) (citing Francis S. v. Stone, 221 F.3d 100, 108-09 (2d Cir. 2000)).

Significantly, a federal court engaged in habeas review is not charged with determining

whether the state court's determination was merely incorrect or erroneous, but instead whether

such determination was "objectively unreasonable."  Williams, 529 U.S. at 409; see also Sellan

v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001).  Objectively unreasonable in this context means

"'some increment of incorrectness beyond error is required'" for a federal court to properly grant

a habeas application.  Earley v. Murray, 451 F.3d 71, 74 (2d Cir. 2006) (quoting Francis S., 221

F.3d at 111).

    **B.**    **Review of Harris' Claims**

        **1.**    **Ineffective Assistance of Counsel**

In his first ground, Harris alleges that he received ineffective assistance of counsel because the attorney who represented him prior to trial, Michael Albanese, Esq., was simultaneously representing (on unrelated charges) Warner, who proved to be a prosecution witness who offered testimony damaging to Harris' defense.  <u>See</u> Petition, Ground One.  He also asserts, in his fifth ground for relief, that his attorney was aware that Warner "was at a minimum a witness in" the prosecution's case against Harris, but nevertheless continued on with the conflicted representation.  <u>See</u> Petition, Ground Five.  Finally, Petitioner suggests in his sixth ground that Attorney Albanese may have been aware of the conflict when he was provided with copies of prior statements that had been made by co-conspirators to law enforcement agents, but failed to take appropriate action.  Petition, Ground Six.

The Sixth Amendment to the United States Constitution provides that:  "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. Amend. VI.  A defendant's Sixth Amendment right to counsel guarantees the right to conflict-free representation.  <u>See</u> <u>Wood v. Georgia</u>, 450 U.S. 261, 271 (1981) ("[w]here a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest"); <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 345 (1980).  In <u>Cuyler</u>, the Supreme Court observed that to establish a violation of this right, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."  <u>Id.</u>, 446 U.S. at 348-49.

The Second Circuit has noted that there are three levels of conflicts of interest to be considered in evaluating a Sixth Amendment claim alleging same: a) a <u>per</u> <u>se</u> conflict, which does not require a showing of prejudice; b) an actual conflict of interest that carries a

presumption of prejudice; and c) a potential conflict of interest that requires a finding of both deficient performance by counsel and prejudice.  See U.S. v. Doe No. 1, 272 F.3d 116, 125 (2d Cir. 2001) (citation omitted).

A "per se" conflict of interest exists only where trial counsel is not authorized to practice law, see Solina v. U.S., 709 F.2d 160, 164 (2d Cir. 1983), or is implicated in the very crime for which his client is on trial, see U.S. v. Cancilla, 725 F.2d 867, 870 (2d Cir. 1984).[7]  Since Petitioner has not established the existence of either circumstance, no per se conflict existed in the state court matter below.

To prove that his attorney labored under an actual conflict of interest during the course of his representation, Harris must demonstrate the existence of three distinct factors.  See Armienti v. United States, 234 F.3d 820, 824 (2d Cir. 2000); United States v. Moree, 220 F.3d 65, 69 (2d Cir. 2000); United States v. Berger, 188 F.Supp.2d 307, 333 (S.D.N.Y. 2002).  First, Petitioner must establish that an "actual conflict of interest" existed, i.e., that "the attorney's and defendant's interests diverge[d] with respect to a material factual or legal issue or to a course of action."  Armienti, 234 F.3d at 824 (citing Winkler v. Keane, 7 F.3d 304, 307 (2d Cir. 1993)); Berger, 188 F.Supp.2d at 333.  He must then establish "adverse effect" as a result of such conflict by demonstrating the existence of "some 'plausible alternative defense strategy'" not pursued by his counsel.  Armienti, 234 F.3d at 824 (citing United States v. Levy, 25 F.3d 146, 157 (2d Cir. 1994)) (other citation omitted).  Finally, Harris must show "that the 'alternative defense strategy was inherently in conflict with or not undertaken due to the attorney's other loyalties or

---

[7] The Second Circuit has consistently refused to extend the per se rule beyond these two limited situations.  See United States v. Rondon, 204 F.3d 376, 379-80 (2d Cir. 2000) (collecting cases).

11

interests.'" <u>Armienti</u>, 234 F.3d at 824 (citing <u>Levy</u>, 25 F.3d at 157) (other citation omitted).[8]

In this case, Harris suggests that his interests and those of Attorney Albanese diverged with respect to a material factual matter, legal issue or course of action because Attorney Albanese was negotiating a plea proposal concerning Warner with the District Attorney in which Warner agreed to testify against Harris in exchange for a favorable plea agreement on behalf of Warner. <u>See</u> Traverse at pp. 2-3.

However, as both the Appellate Division and the Court of Appeals observed, the only **<u>evidence</u>** before the Court establishes that although Attorney Albanese encouraged Warner to cooperate with the authorities in the context of counsel's representation of Warner, counsel was **<u>unaware</u>** that such cooperation including his assistance in the prosecution of Harris. <u>See</u> <u>Harris</u>, 288 A.D.2d at 613-14; <u>Harris</u>, 99 N.Y.2d at 210-11.

Moreover, Judge Catena specifically considered and rejected Harris' claim in his CPL Motion – and reiterated by Petitioner in both his fifth and sixth grounds for relief – which suggests that Attorney Albanese was aware that Warner was to be a witness for the prosecution against Harris at his trial. <u>See</u> August, 2004 Order at 1-2. Harris has not presented any persuasive evidence which demonstrates that Judge Catena's determination was erroneous in any way.

In sum, Harris has failed to establish that Attorney Albanese did not pursue an alternative defense strategy due to his other loyalties or interests. Petitioner therefore has not established

---

[8] An actual conflict in this context may not be a mere theoretical division of loyalties, but instead must be a conflict that adversely affects counsel's performance. <u>Mickens v. Taylor</u>, 535 U.S. 162, 170-72 & n.5 (2002). Thus, an actual conflict of interest must result in an "actual lapse in representation" caused by an attorney who actively represents individuals with conflicting interests. <u>Cuyler</u>, 446 U.S. at 349.

that his attorney labored under an actual conflict of interest with respect to Harris.  E.g.,

Armienti, 234 F.3d at 824 (citations omitted).

Finally, any argument that Harris is entitled to habeas relief on this claim due to a

potential conflict of interest that existed between himself and Attorney Albanese must fail

because Petitioner has wholly failed to establish that he was prejudiced by the pre-trial dual

representation.  See Doe No. 1, 272 F.3d at 126.  In this regard, the Court adopts the Appellate

Division's determination that counsel's "innocent overlapping pretrial representation of the

informant did not negatively impact [Attorney] Albanese's pretrial representation of Harris."

Harris, 288 A.D.2d at 614.

Harris has not demonstrated that the denial of his ineffective assistance claim by the state

courts is either contrary to, or represents an unreasonable application of, Strickland and its

progeny.  Nor has he demonstrated that Judge Catena erred in denying the portion of Harris' CPL

Motion in which he claimed that Attorney Albanese was likely aware that Warner was assisting

the prosecution in preparing its case against Harris.  The Court therefore denies Harris' first

ground for relief, as well as the portion of his fifth and sixth grounds which argue that Attorney

Albanese was aware of the claimed conflict of interest during the course of his representation of

Harris.

### 2.    Exclusion From In Camera Hearing

In his second ground for relief, Harris asserts that he was wrongfully excluded from the in

camera meeting conducted by Judge Lomanto with counsel involving juror Lamb.  Petition,

Ground Two.  He asserts that he "likely had information" regarding the possible tainting of that

juror, id., and specifically argues that he could have informed counsel of the substance of his

wife's conversations with Lamb.  Traverse at p. 7.  He further suggests that the County Court

erred in failing to question his wife about her interactions with the juror.  Id.  Petitioner also

asserts that Judge Lomanto wrongfully failed to advise Harris of the substance of the in camera

meeting that had taken place with Lamb in Harris' absence, including the statements that Lamb

had made regarding her interaction with Harris' wife.  Traverse at pp. 5-6.  Finally, he contends

that Lamb was aware of the fact that the woman with whom she spoke was Harris' wife before

Lamb was chosen as a juror, but that she nevertheless continued to interact with Petitioner's wife

even after Lamb was selected on the panel.  Traverse at pp. 6-7.

It is well settled that a criminal defendant's presence at trial is required "to the extent that

a fair and just hearing would be thwarted by his absence."  Snyder v. Massachusetts, 291 U.S. 97,

107-08 (1934), overruled on other grounds by Malloy v. Hogan, 378 U.S. 1 (1964); see also

Illinois v. Allen, 397 U.S. 337, 338 (1970).  This guarantee encompasses the right "to be present

at all stages of the trial where his absence might frustrate the fairness of the proceedings," Faretta

v. California, 422 U.S. 806, 819 n.15 (1975), and assures that an accused may even attend

hearings in which he is not actually confronting witnesses or evidence against him.  See

Kentucky v. Stincer, 482 U.S. 730, 745 (1987); United States v. Gagnon, 470 U.S. 522, 526

(1985) (per curiam).  As the Supreme Court has recognized, however, this right to be present is

not absolute; it is triggered only when the defendant's "presence has a relation, reasonably

substantial, to the fu[l]lness of his opportunity to defend against the charge."  Snyder, 291 U.S. at

105-06.  Thus, there is no constitutional right to be present when the defendant's presence at a

proceeding "would be useless, or the benefit but a shadow."  Snyder, 291 U.S. at 106-07.

Accordingly, when there is no indication that a defendant "could have done anything had he been

at the hearing nor would he have gained anything by attending," no due process violation results

from the holding of a hearing in a defendant's absence.  Stincer, 482 U.S. at 747; Cohen v.

Senkowski, 290 F.3d 485, 489 (2d Cir.  2002) ("the right to be present is not absolute: it is

triggered only when the defendant's 'presence has a relation, reasonably substantial, to the

fu[l]lness of his opportunity to defend against the charge'") (quoting Snyder); see also Bohan v.

Kuhlmann, 234 F.Supp.2d 231, 268 (S.D.N.Y. 2002) (citing Stincer).  When the proceeding is a

"short interlude in a complex trial," it is not considered "material" under the due process clause.

Gagnon, 470 U.S. at 527.  In specifically addressing in camera discussions with jurors held

outside the presence of a defendant, the Supreme Court has emphasized that "'[t]he defense has

no constitutional right to be present at every interaction between a judge and a juror.'"  Gagnon,

470 U.S. at 526 (quoting Rushen v. Spain, 464 U.S. 114, 125-26 (1983)) (Stevens, J., concurring

in judgment).

        This Court initially finds that the inquiry conducted by the County Court was not

necessarily a material stage of the trial at which Harris had a right to be present.  The Second

Circuit has observed that the constitutional requirement that a defendant be present at all stages

of his trial is to be applied in a flexible, "common sense" manner.  Clark v. Stinson, 214 F.3d

315, 322-23 (2d Cir. 2000).  Significantly, the Clark court cited with approval a holding of the

New York Court of Appeals which concluded that the questioning of a juror outside the

defendant's presence does **not** constitute a material stage of trial.  See Clark, 214 F.3d at 322-23

(citing People v. Mullen, 44 N.Y.2d 1, 5-6 (1978)); see also Cruz v. Artuz, No. 97-CV-2508,

2002 WL 1359386, at *12 (E.D.N.Y. June 24, 2002) (rejecting petitioner's claim he was denied a

fair trial because he was not present at trial court's in camera inquiry of three jurors following

15

their encounter with petitioner's eight-year-old son outside the courtroom because the proceeding was not a material stage of the trial).

Moreover, even assuming, <u>arguendo</u>, that the conference was a material stage of Harris' trial, he has not demonstrated that his absence from the inquiry bore a reasonable relationship to his opportunity to defend.  Although Petitioner now claims that he could have assisted his attorney in questioning Lamb regarding her encounters with Harris' wife, conspicuous by its absence from the record is any evidence that addresses the **<u>substance</u>** of any of the claimed conversations between Harris and his wife that related to her interaction with the juror. Consequently, this Court could not properly find that Harris' defense would have benefitted had he been present at that conference.  Furthermore, as noted above, Lamb expressed some unease following her interaction with Harris' wife.  Petitioner's presence at the <u>in camera</u> meeting may well have **<u>hindered</u>** the fact-finding process in which the trial court was required to engage because Lamb may not have believed she could speaking freely and honestly about her interactions and beliefs in his presence.  <u>E.g.</u> <u>Gagnon</u>, 470 U.S. at 526-27 (finding that the presence of defendants and their counsel "could have been counterproductive" where court held <u>in camera</u>, <u>ex parte</u> inquiry of a sworn juror who expressed concern about the fact that the defendant had been sketching the jury during the proceedings); <u>United States v. Peterson</u>, 385 F.3d 127, 138 (2d Cir. 2004) (indicating that <u>in camera</u> conversation between trial judge and sworn juror who informed other jurors, during deliberations, that she believed she had known the defendants in the past, did not require defendants' attendance because, <u>inter alia</u>, their "presence may have prevented [the] juror . . . from speaking openly").  Finally, the continuous presence of Harris' counsel during the hearing, and his active participation in the questioning of Lamb,

16

ensured the fundamental fairness of this aspect of the trial.  E.g. Pellington v. Greiner, 307 F.

Supp. 2d 601, 606 (S.D.N.Y. 2004) ("courts have repeatedly indicated that in most instances, the

presence of defense counsel at a conference between a judge and juror adequately protects the

defendant's interests"), aff'd, 132 Fed.Appx. 868 (2d Cir. 2005) (citations omitted).  Thus, Harris

has failed to establish that the fairness of his trial was "thwarted" by his absence from a portion

of the above-referenced hearing.[9]

Based upon the foregoing, this Court concludes that the denial of this appellate claim by

the Court of Appeals, see Harris, 99 N.Y. 2d at 212-13, is neither contrary to, nor represents an

unreasonable application of, clearly established Supreme Court precedent.  Harris' second

ground for relief is therefore denied.

### 3.    Failure to Remove Lamb as Juror

In his third ground, Harris asserts that the trial court committed reversible error when it

declined to dismiss Lamb from the jury following the in camera meeting with that juror.

---

[9] Moreover, Harris waived any right to be present.  He was present when counsel and the Court discussed what transpired during the questioning of Lamb and the other jurors, as well as during the arguments counsel made regarding the mistrial applications.  See Trial Tr. at pp. 682-690.  Although Harris directly addressed Judge Lomanto at that time, see id. at p. 689, he never objected to his absence from the prior meeting, asserted the need for further questioning of any of the jurors, or requested permission to supplement the fact-finding process.  Thus, even if the conference was a material stage of his criminal trial, Harris' failure to lodge any objections to his absence amounted to a waiver of his right to be present.  E.g., United States v. Jones, 381 F.3d 114, 122 (2d Cir. 2004) (holding that the defendant waived his right to be present when he "never objected to his absence from the in-chambers hearing, even though he was present during the subsequent hearing in open court when the court made its ruling"); Pounce v. McLaughlin, No. 04 CV 668, 2004 WL 2360037, at *8 (E.D.N.Y. Oct. 20, 2004) (finding that defendant's presence in the court when the County Court announced that a juror would remain was a "sufficient opportunity" for him to object to his absence from the conference), appeal dismissed, Pounce v. McLaughlin, No. 05-0596, slip op. (2d Cir. Aug. 30, 2005).

Petition, Ground Three.

A trial court's finding of impartiality on the part of jury members may be overturned only on a finding of "manifest error." Patton v. Yount, 467 U.S. 1025, 1031 (1984).  Habeas courts are to afford a trial court's conclusion as to whether a juror is qualified to remain on a panel "special deference." Id. at 1037 n.12 (citations omitted); see also Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 813 (2d Cir. 2000) ("[o]n § 2254 review, the state trial court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial").  Because the trial court is in a "unique position to observe the juror," its decision on the issue of whether a juror may properly remain on the panel is to be afforded "great weight." Johnson v. Ricks, No. 02-CV-1366, 2007 WL 3171782, at *7 n.10 (Oct. 29, 2007) (McCurn, S.J.) (quoting People v. Pinckney, 220 A.D.2d 539, 539-40 (2d Dept. 1995)) (other citations omitted).

The record establishes that after hearing the argument of counsel following the in camera conference discussed above, Judge Lomanto concluded that none of the jurors engaged in misconduct, and accordingly denied the mistrial and juror disqualification motions made by counsel.  Trial Tr. at pp. 690-91.

Both the Appellate Division and the Court of Appeals concluded that Judge Lomanto made a "probing and tactful" inquiry during the subject conference. See Harris, 288 A.D.2d at 616; Harris, 99 N.Y.2d at 213.  In conjunction with this ground for relief, the transcript of the in camera hearing over which the County Court presided relating to this issue has been reviewed. That review has satisfied this Court that Judge Lomanto properly denied the requests made by counsel for both Harris and Wright to have Lamb removed from the panel.  Since petitioner has not demonstrated that the trial court's decision to permit that juror to remain on the jury was

erroneous in any way, he is not entitled to habeas relief on this claim.

### 4.    Testimony of Prosecution Witnesses Deprived Harris of Fair Trial

In his fourth ground for relief, Harris asserts that he was deprived of his right to a fair trial due to the testimony offered by two prosecution witnesses.  Petition, Ground Four.  Specifically, he argues that one witness was wrongfully permitted to testify that she did not wish to disclose information about her employment because it might jeopardize her safety, while another witness improperly declared that testifying at the trial "could get him killed."  Id.  Petitioner asserts that the foregoing testimony, coupled with the concern that juror Lamb expressed regarding her own safety, as well as that juror's interaction with other jury members, deprived him of his right to a fair trial.  Id.

The record reflects that when counsel for co-Defendant Wright asked Cannizzo on cross-examination where she was employed, Cannizzo responded:  "I'd rather not disclose that.  I don't feel I need to.  Why do I need to disclose where I'm working at this time?"  Trial Tr. at p. 883.  An off-the-record sidebar was then held.  Trial Tr. at pp. 883-84.  After that conference, Judge Lomanto asked Cannizzo, "is there a reason why you do not want to answer the question as to where you're working," she responded, over the objection of Wright's counsel, "[f]or my own personal safety."  Trial Tr. at p. 884.[10]  Harris' counsel did not object to that testimony.

Additionally, when Hill was testifying on behalf of the prosecution, he noted that he had entered into a cooperation agreement with the prosecution in which he agreed to testify against Harris and Wright, and to plead guilty to narcotics charges relating to the drug activities with the

---

[10] Wright's counsel then moved for a mistrial, which was denied by Judge Lomanto. Trial Tr. at pp. 884-85.

19

co-defendants and Cannizzo.  Trial Tr. at pp. 1065-68.  On cross-examination, Wright's counsel

inquired of Hill whether he had thought about the consequences of what might happen if he

failed to testify for the prosecution, to which the witness responded "Yeah."  Trial Tr. at p. 1088.

On re-direct examination, the District Attorney explored with Hill what he meant by his

response, to which he replied there were "a whole bunch of consequences . . . I could get killed.

This isn't a favorable act where I live."  Trial Tr. at p. 1091.  Petitioner's counsel did not object

to that testimony.

        Claimed evidentiary errors by state courts are not ordinarily subject to habeas review

unless they deprive a defendant of a fundamentally fair trial.  Estelle v. McGuire, 502 U.S. 62,

72-75 (1991).  A party is entitled to habeas relief on a claim that evidence was improperly

admitted against him only where the introduction of that evidence "so infused the trial with

unfairness as to deny [the defendant] due process of law."  Lisenba v. California, 314 U.S. 219,

228 (1941).  The introduction of improper evidence against a defendant does not amount to a

violation of due process unless the evidence "is so extremely unfair that its admission violates

fundamental conceptions of justice."  Dowling v. United States, 493 U.S. 342, 352 (1990).  As

the Dowling Court noted, only a very narrow class of such evidentiary infractions violates

fundamental fairness.  Dowling, 493 U.S. at 352; see also Dunnigan v. Keane, 137 F.3d 117, 125

(2d Cir. 1998); Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) (stating that improperly

admitted evidence results in a due process violation only if "the error was so pervasive as to have

denied [the petitioner] a fundamentally fair trial").  Furthermore, "not all erroneous admissions of

such evidence are errors of constitutional dimension."  Dunnigan, 137 F.3d at 125.  To the

contrary, "[t]he introduction of improper evidence against a defendant does not amount to a

violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" Id. (quoting Dowling); see also Wray v. Johnson, 202 F.3d 515, 526 (2d Cir. 2000); Lopez v. Fischer, No. 05 CIV.2558, 2006 WL 2996548, at *10 (S.D.N.Y. Oct. 16, 2006) (citations omitted).  The task for the federal habeas court, therefore, is to determine "whether the erroneously admitted evidence, viewed objectively in light of the entire record . . . was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.  In short it must have been crucial, critical, highly significant." Collins, 755 F.2d at 19 (internal quotation and citation omitted); Dalcin v. New York, 438 F.Supp.2d 176, 182 (W.D.N.Y. 2006) (citations omitted).

During counsels' cross-examinations of both Hill and Cannizzo, the attorneys for Harris and Wright elicited testimony that related to the state of mind of those witnesses and their reason for testifying on behalf of the prosecution.  E.g. Trial Tr. at 880-81 (Wright's counsel noting that his questioning sought to "cross-examine [Cannizzo] as to her state of mind"); 1068-81 (Harris' counsel exploring the reason Hill agreed to testify for the prosecution and matters that he "considered" before testifying).

Where the cross-examination of witnesses focuses on the fact that their testimony was motivated by self-interest and an attempt to obtain lenient treatment, a trial court may properly allow testimony which suggests that "such cooperation was also against the [witnesses'] interest to a significant extent." People v. Edwards, 261 A.D.2d 260, 261 (1st Dept. 1999).  Furthermore, as noted above, Harris' counsel failed to object to the testimony of Hill and Cannizzo upon which Petitioner now relies in support of this aspect of his habeas petition.  That fact casts significant doubt on a subsequent claim which alleges that a party was prejudiced by such

21

testimony.  E.g., Rojas v. Senkowski, No. 95-CV-1866, 1996 WL 449321, at *4 (E.D.N.Y. July 29, 1996) (citation omitted) (counsel's failure to object to allegedly improper remark of prosecutor "undermines the seriousness of petitioner's claim of error").

Based upon the foregoing, this Court concludes that the decision of the Court of Appeals which rejected this appellate claim, see Harris, 99 N.Y.2d at 213, is neither contrary to, nor represents an unreasonable application of, Lisenba and its progeny.  Harris' fourth ground for relief is therefore denied.

### 5.  **Brady Violation**

In his sixth ground for relief,[11] Harris asserts that he was deprived of his right to a fair trial because the district attorney "intentionally withheld exculpatory evidence" from the defense. See Petition, Ground Six.  Specifically, he asserts that "prior statements of accomplices made to law enforcement" were not disclosed to the defense, which in turn hampered trial counsel's ability to effectively cross-examine prosecution witnesses.  Id.

In denying this claim when asserted by Harris in the context of his CPL Motion, Judge Catena found Harris' allegations regarding the time at which the statements were disclosed by the prosecution to have been "belied by the record."  August, 2004 Order at p. 1.

To prove a Brady violation, a habeas petitioner must establish that:  1) the evidence at issue was favorable to the accused, either because it was exculpatory or could have impeached a prosecution witness; 2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and 3) prejudice ensued from the withholding.  Moore v. Illinois, 408 U.S. 786,

---

[11] This Court addressed the substance of Harris' fifth ground supra in conjunction with its analysis of his first ground which argued that Harris received the ineffective assistance of trial counsel.

794-95 (1972); see also Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

The record reflects that during a conference conducted between counsel for Harris, Wright and the County Court, a discussion was held regarding the pre-trial statements made by Cannizzo and Hill.  See Trial Tr. at p. 932.  When Judge Lomanto stated that he had assumed that counsel for the defense had "got[ten] all of those," the district attorney responded "[t]hey do, your Honor."  Id.  Since Harris' counsel did not dispute that statement of the prosecutor, it is patent that counsel was in possession of those statements before those witnesses testified.[12]

To establish that evidence was "suppressed" by the prosecution in a Brady sense, a petitioner must demonstrate that his attorney did not possess the requested evidence in time for its effective use at trial.  "[A]s long as a defendant possesses Brady evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner."  Lutes v. Ricks, 02-CV-1043, 2005 WL 2180467, at *15 n.19 (N.D.N.Y. Sept. 9, 2005) (internal quotation and citations omitted).

The above-cited exchange between the Court and defense counsel conclusively establishes that Harris' counsel had been provided copies of the prior statements that Cannizzo and Hill had made to law enforcement agents before such witnesses testified at trial.  E.g. Trial Tr. at p. 932.  Since Harris has not demonstrated that those statements were "suppressed" by the prosecutor, he has necessarily failed to establish that the County Court's denial of his Brady claim is either contrary to, or represents an unreasonable application of, Brady and its progeny.  Petitioner's sixth ground for relief is therefore denied.

### 6.   Subornation of Perjury

_____

[12] The excerpt of the trial transcript quoted above occurred immediately after Cannizzo testified and prior to Hill's testimony.

In his seventh and final ground, Harris claims that the prosecutor elicited false testimony from Warner when that witness declared that he personally knew Harris and recognized him as being present at the Caroga Lake residence when Warner purchased drugs.  See Petition, Ground Seven.  Petitioner also argues that the District Attorney knowingly supplied a false criminal history sheet to the County Court and counsel for Harris and Wright.  Id.

Harris raised these claims in his CPL Motion, which was denied by the County Court. See August, 2004 Order at pp. 1-2.

The Supreme Court has noted that a conviction obtained by the knowing use of perjured testimony on the part of the prosecution "is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976) (footnote omitted).  Additionally, "[a] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."  Napue v. Illinois, 360 U.S. 264, 269 (1959).

As noted in Toland v. Walsh, No. 04-CV-0773, 2008 WL 65583 (N.D.N.Y. Jan. 4, 2008):

> To prevail on [a perjury claim], [petitioner] must initially
> demonstrate that perjury was in fact committed at his trial.  See
> United States v. White, 972 F.2d 16, 20 (2d Cir.1992); Vail v.
> Walker, No. 96-CV-578, 1997 WL 695583, at *5 (N.D.N.Y. Nov.
> 4, 1997) (Homer, M.J.) (citing White ), adopted Vail v. Walker,
> No. 96-CV-578 (Dkt. No. 49) (N.D.N.Y. Aug. 24, 1999) (Scullin,
> J.), appeal dismissed, Vail v. Walker, No. 99-2554 (2d Cir. Mar.
> 23, 2001).

Toland, 2008 WL 65583, at *22.

Harris offers no proof that supports his claim that Warner's testimony was perjurious.[13]

---

[13] Petitioner failed to cite the portion of Warner's testimony wherein the allegedly perjurious statements were made, and this Court was unable to locate testimony that supported this claim.

The petitioner bears the burden of proving in his habeas petition that his constitutional rights were violated in the state court proceeding.  See Whitaker v. Meachum, 123 F.3d 714, 716 (2d Cir. 1997) (citing Walker v. Johnston, 312 U.S. 275, 286 (1941) (petitioner has the burden on collateral review of "sustaining his allegations by a preponderance of evidence")) (other citations omitted); Lovacco v. Kelly, No. 99 CV 3094, 2005 WL 2482518, at *3 (S.D.N.Y. Oct. 7, 2005) (citation omitted); Frazier v. New York, 187 F.Supp.2d 102, 108 (S.D.N.Y. 2002) (citation omitted); Nunez v. Miller,  No. 00 CIV 0966, 2001 WL 1773731, at *8 (E.D.N.Y. July 12, 2001) (citations omitted).  Harris' failure to provide factual support for his perjury claim represents a failure on his part to shoulder his burden of proof in this action.

As to the criminal history sheet provided by D.A. Hoye, the record reflects that prior to Warner's testimony, the prosecutor provided counsel for the defendants and the court with a copy that witness's criminal history.  Trial Tr. at p. 948.  It was subsequently established that a prior conviction of Warner for "AUO"[14] in the second degree was absent from the list of convictions detailed on the sheet supplied to defense counsel regarding Warner's prior convictions.  Trial Tr. at pp. 952, 958.  When questioned about that omission, the District Attorney declared that she had never received any record of that conviction, and was completely unaware of same.  Trial Tr. at pp. 957-58.  Petitioner has wholly failed to establish that the prosecutor intentionally withheld information relating to the AUO conviction from defense counsel or the court.  Moreover, the numerous crimes of which Warner was convicted were discussed during his direct examination, see Trial Tr. at 1009-1013, and Harris' counsel chose not to ask any question of this witness –

---

[14] Though never clearly stated in the record, it appears that "AUO," as referenced at Harris' trial, refers to the charge of aggravated unlicensed operation of a motor vehicle.  See N.Y. Vehicle and Traffic Law § 511[2].

including whether he was convicted of any crimes not brought out on direct examination or contained in the list of convictions provided to defense counsel – during cross-examination.  See id. at p.1018.  He has therefore failed to establish either misconduct on the part of D.A. Hoye, or any prejudice as a result of the cited omission.

In sum, Petitioner has failed to establish any perjury on the part of Warner at Harris' trial, or that the prosecutor knowingly provided false information to the court and/or defense counsel regarding that witness.  Moreover, he has wholly failed to demonstrate that his defense was prejudiced, in any way, by the fact that a prior conviction of Warner was inadvertently omitted from the criminal history sheet provided to defense counsel before that witness testified at trial. For all of these reasons, the Court concludes that Harris has not demonstrated that the County Court's denial of this claim, see August, 2004 Order at pp. 1-2, is either contrary to, or represents an unreasonable application of, the above-referenced Supreme Court precedent.  This Court accordingly denies Harris' final ground seeking federal habeas intervention.

## III.  Certificate of Appealability

Finally, the Court notes that 28 U.S.C. § 2253(c)(1) provides in relevant part that:

> Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
>
> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court ....[15]

A Certificate of Appealability may only be issued "if the applicant has made a substantial showing of the denial of a constitutional right."  See 28 U.S.C. § 2253(c)(2).  Since Harris has

---

[15] Rule 22 of the Federal Rules of Appellate Procedure also provides that an appeal may not proceed "unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)."  See Fed.R.App.P. 22(b).

failed to make such a showing herein, the Court declines to issue any Certificate of Appealability in this matter.

**WHEREFORE**, after having reviewed the state court record, the documents submitted by the parties in conjunction with this action, the applicable law, and for the reasons discussed herein, it is hereby

**ORDERED**, that the Harris' Petition (Dkt. No. 1) is **DENIED** and **DISMISSED** in its entirety; and it is further

**ORDERED**, that the state court records not filed herein be returned directly to the Attorney General at the conclusion of these proceedings (including any appeal of this Memorandum-Decision and Order filed by any party), and it is further

**ORDERED**, that no Certificate of Appealability shall issue with regard to any of Petitioner's claims; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order upon the parties by regular or electronic mail.

**IT IS SO ORDERED**.

DATED:      August 04, 2008
            Albany, New York

Lawrence E. Kahn
U.S. District Judge